## UNITED STATES WHIP CO. v. HASSLER.

(Circuit Court, D. Massachusetts.   January 4, 1905.)

### No. 1,672.

1. PATENTS—REISSUE—LIMITATION TO ORIGINAL INVENTION.

A reissued patent must be confined to the invention which was intended to be secured by the original patent. Devices or parts which, although described or shown in the specification or drawings of the original patent, were not a part of the invention, as therein disclosed, cannot be covered by a reissue.

[Ed. Note.—For cases in point, see vol. 38, Cent. Dig. Patents, §§ 206–213.]

2. SAME—TENSION FOR BRAIDING MACHINES.

The Turner reissued patent, No. 12,058 (original No. 679,650), for a tension device for the racers of braiding machines, is void, as not being for the same invention as that of the original patent.

In Equity. Suit for infringement of reissued letters patent No. 12,058, for a tension for braiding-carriers, granted November 25, 1902, to Julius A. Turner. On final hearing.

Oliver R. Mitchell, for complainant.
Allen Webster, for defendant.

COLT, Circuit Judge. This is a bill in equity for infringement of the Turner reissued patent, No. 12,058, dated November 25, 1902. The patent relates to tension devices for racers used in whiplash-braiding machines. The original patent was issued July 30, 1901. This case was heard at the same time as the closely related case of Mesick v. Hassler, 134 Fed. 395. In the opinion of the court in that case, the subject of tension devices is considered in connection with an earlier Turner patent.

The first ground of defense in the present case is that the claims of the reissued patent are invalid because they are not for the same invention as the original patent.

A reissue may be granted for the invention intended to be secured by the original patent, but which the patentee, through inadvertence, accident, or mistake, has failed to secure by that patent. The validity of the reissue in suit involves, therefore, two inquiries: First. What invention did the patentee intend to cover by his original patent? Second. Do the claims of the reissued patent cover this invention, or a different invention?

It may be first noted that the brake-wheel tension of the earlier Turner patent has been discarded in the patents in suit, and that we now have a device confined to the abrasive or rubbing tension type.

Turning now to the original Turner patent in suit, we find that the purpose of the invention is stated at the beginning of the specification in the following language:

"The purpose of the invention is to provide a simple tension for racers for braiding-machines, particularly whiplash-braiding machines, comprising a fixed guide-block, a pivoted pressure-block, and a convenient means for moving the pressure-block and regulating its pressure against the thread or strand."

Outside of a comparatively minor improvement relating to the reel mechanism, it will be found that what follows in the specification is entirely consistent with this statement. In other words, the substantial invention which Turner intended to cover by his original patent related to the means by which the movable tension member may be made to bear with greater or less pressure against the fixed tension member, and also to the means whereby the movable tension member will have such a rocking movement as will enable it to accommodate itself to any irregularities in the strand of leather.

The specification continues:

"The invention consists in the novel construction and combination of the several parts, as will be hereinafter fully set forth, and pointed out in the claim."

Then follows a description of the improvement in the reel devices, which comprise a spring-controlled brake and a cap so suspended as to impart motion to the reel when the "cap is forced down to a frictional engagement with the cone of the reel." The specification then proceeds, in substance, as follows: With reference to the tension device, a thread-guide, or fixed tension member, is located on the bedplate. This thread-guide comprises upper and lower plates connected at their ends by posts set in the base or frame. The strand passes into engagement with the inner face of both of the posts, and around one of the posts and over another fixed guide-pin to the work. Adjacent to the thread-guide, or fixed tension member, apertured lugs are removably attached to the base, and a stem or rod is mounted to slide freely in the apertures of these lugs. This rod is provided at a point between the lugs with a threaded section. A spring is also coiled around the rod, having bearings against one of the lugs and against a nut on the threaded portion of the rod. By adjusting the nut, the spring may be placed under more or less tension. At one end of the rod there is a knob, and at the opposite or inner end a pressure-block, or movable tension member, which is pivotally attached to the rod. The thread passes between the pressure-block, or movable tension member, and the thread-guide, or fixed tension member. The pressure-block is also provided at the end nearest the reel with a forked foot, which serves properly to direct the thread. The above description relates to the adjustable means employed, by which the movable tension member may be made to bear with greater or less pressure against the fixed tension member. The specification then goes on to describe the means by which the movable tension member is given a rocking movement: There are two lugs on the edge of the pressure block, and a head upon the rod, which enters the space between these lugs. A pivot-pin passes through these lugs at their center, and through the central portion of the head.

"Thus it will be observed that the pressure-block is capable of a rocking movement, and may accommodate itself to irregularities in the thread, and that it will have at all times a perfect bearing against the length of the thread with which it comes in contact."

The specification then declares that a strand may be inserted between the thread-guide and the pressure-block by drawing out the rod through the medium of the knob, and that by adjusting the nut the

spring will cause the pressure-block to bear with greater or less force against the thread, "so that the tension on the thread may be minutely regulated."

The last paragraph in the specification describes how the rod may be placed in position in the lugs when the lugs are removed from the base, and how it may then be returned to its proper position on the base.

The single claim of the patent reads as follows:·

"In a tension for braiding-carriers, the combination, with a base, a reel mounted to revolve upon the base, a brake for the reel and a stationary thread-guide secured upon the base at one side of the reel, which guide is in the form of a rectangular block, of a tension rod or stem, one end of which faces the thread-guide, supports in which the rod or stem has sliding movement, said rod or stem being provided with a thread between its ends, a nut upon the threaded portion of the rod or stem, and a spring encircling the rod, resting against the nut and a bearing for the rod, a knob at the outer end of the tension-rod, and a head at its inner end, a pressure-block parallel with and close to the stationary thread-guide, a pivotal connection between the pressure-block and head of the tension-rod, and a bifurcated guide member at one end of the pressure-block, extending in direction of one end of the stationary thread-guide, as set forth."

This examination of the original Turner patent shows that the essence of the invention intended to be secured by that patent lay in the movable tension member, which, by virtue of its compound vertical and pivotal movements, was capable of nice adjustment with respect to the thread-guide or fixed tension member. That this was the real invention is further illustrated by claim 1 and an extract from claim 3 of the rejected claims contained in the original application:

"(1) A tension device for the racers of braiding machines, comprising a stationary thread-guide, a spring-controlled pivoted pressure-block movable to and from the thread-guide, and a regulating device for the spring-controlled pressure-block."

"(3) * * * whereby the pressure-block may be made to bear with greater or less force against the thread at the main thread-guide, and whereby also the pressure-block will have even bearing upon the thread and will accommodate itself to any irregularities."

Turning now to the specification of the reissued patent we find that the "guide-pin, 16," of the original specification, becomes the "tension pin, 16." This is the guide-pin which is located on the frame nearest the work. The following lines are also added to the original specification:

"This pin, 16, forms a second guide for the strand, 15, and is so located as to cause the strand between the reel and the work to make an abrupt change in its direction at said pin itself, and also at the lower or inner end of the first tension. The frictional resistance to the movement of the strand produced by this arrangement results in putting a normal drag on the strand, and means are provided for adding to this normal drag as may be desired and to any extent within practical limits by pressing the strand against the face of the first tension-block in advance of an angular change of direction of the first strand about this first tension-block."

At the close of the reissued specification follow these somewhat remarkable claims, as descriptive of the invention:

"(1) In a braiding-carrier, the combination of a base; a reel mounted thereon; a tension-block fast to the base; a pressure-block; means to force the pressure-block forward to cause the strand to be pressed against the tension-

block and another tension-block fast to the base and positioned to cause the strand to make an abrupt change of direction between the first-mentioned tension-block and the work.

"(2) In a braiding-carrier, the combination of a base; a reel mounted thereon; a tension-block fast to the base; a pressure-block; adjustable means to press the pressure-block forward to cause the strand to be pressed against the tension-block; another tension-block fast to the base and organized and arranged to cause the strand to make an abrupt change of direction between the first-mentioned tension-block and the work.

"(3) In a braiding-carrier, the combination of a base; a reel mounted thereon; a tension-block fast to the base; a pressure-block; means to press the pressure-block forward to cause the strand to be pressed against the tension-block, the parts being organized and arranged to cause the strand to make an abrupt change of direction around the tension-block as it passes to the work.

"(4) In a braiding-carrier, the combination of a base; a reel mounted thereon; a tension-block fast to the base; a pressure-block; means to press the pressure-block forward to cause the strand to be pressed against the tension-block; there being means to cause the strand to make an abrupt change of direction around the tension-block as it passes to the work."

On reading these claims, we are at once impressed with the circumstance that they contain no reference to the specific means for adjusting the pressure-block or movable tension member. By reason of this omission they ignore the main purpose of the invention, as set forth by the patentee in his original patent, which was "to provide a simple tension for racers * * * comprising a fixed guide-block, a pivoted pressure-block, and a convenient means for moving the pressure-block and regulating its pressure against the thread or strand." In these claims the invention is shifted from the complicated and delicate adjustable mechanism of the movable tension member to the comparatively unimportant fixed guide-pin near the top of the base, which does not appear to have been considered of sufficient consequence to be mentioned either in the claim of the original patent or in the twice rejected series of claims filed with the first application. The patentee has now discovered that his real invention lay in this guide-pin, or, rather, in the position of this guide-pin when so located on the base as to cause the strand to make an abrupt turn around the outer end or post of the fixed tension member. And upon this ground it is sought by this reissue to enlarge the invention to a mode of operation which will cover all tension devices in which, by reason of a fixed pin or other means, the strand, as it passes out from between the fixed tension member and the movable tension member, will make an abrupt change of direction between the fixed tension member and the work.

There are two fatal objections to these claims: They do not describe the actual invention which Turner intended to patent, as disclosed in his original patent; and, further, by reason of their breadth, they become void in view of the prior art. With respect to the first objection, we have already pointed out that the actual invention which Turner contemplated related, except as to a minor improvement in the reel mechanism, to the adjustability of the moving tension member. As to the second objection, it is manifest that, in the existing state of this art, there was no invention in causing a strand to make an abrupt turn around the fixed tension member by means of another tension pin. When the strand leaves the two tension members proper, it would be the most natural thing to locate the additional pin which leads the

strand to the work so as to gain additional tension by abruptly changing the direction of the strand. This feature was known in the infancy of the tension art, as it was known to the first sailor who ever wound a rope around a belaying pin.

The complainant's argument respecting reissued patents is founded upon an unsound proposition. It is not true that anything which is disclosed in the original patent may be covered by a reissue. The fundamental inquiry is, what was the invention which the patentee intended to patent? Whatever else the original specification contains is dedicated to the public. It is true that the specification and drawings of the original Turner patent disclose the fixed guide so located that the strand makes an abrupt change of direction between the fixed tension-block and the work, but this circumstance alone is not sufficient to entitle the patentee to the broad claims contained in the reissue. Upon this point the language of the Supreme Court in Parker & Whipple Company v. Yale Clock Company, 123 U. S. 87, 8 Sup. Ct. 38, 31 L. Ed. 100, is very applicable. In that case the court, in commenting on the case of Seymour v. Osborne, 11 Wall. 516, 20 L. Ed. 33, said:

"In these extracts from the opinion it is seen that the court adheres strictly to the view that, under the statute, the commissioner has no jurisdiction to grant a reissued patent for an invention substantially different from that embodied in the original patent, and that a reissue granted not in accordance with that rule is void. In what is there said about redescribing the invention, and about including in the new description and new claims what was suggested or indicated in the original specification, drawings, or Patent Office model, it is clearly to be understood, from the entire language, that the things so to be included are only the things which properly belonged to the invention as embodied in the original patent; that what that invention was is to be ascertained by consulting the original patent; and that, while the new description may properly contain things which are indicated in the original specification, drawings, or Patent Office model, though not sufficiently described in the original specification, it does not follow that what was indicated in the original specification, drawings, or Patent Office model is to be considered as a part of the invention, unless the court can see, from a comparison of the two patents, that the original patent embodied, as the invention intended to be secured by it, what the claims of the reissue are intended to cover." 123 U. S. 98, 99, 8 Sup. Ct. 44, 31 L. Ed. 100.

The claims of the Turner reissued patent, not being for the same invention as that of the original patent, must be held to be void.

Bill to be dismissed.